Nicholas Racioppi, Jr., Esq.
MarcD'Angiolillo, Esq.
RIKER, DANZIG LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800
nracioppi@riker.com
mdangiolillo@riker.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LCG 1 CHAPEL AVE LLC,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES DEPARTMENT OF THE ARMY,<br><br>Defendant. | Case No. 21-1830<br><br>Judge Ryan T. Holte |

**AMENDED COMPLAINT**

Plaintiff, LCG 1 Chapel Ave LLC ("Plaintiff" or "LCG"), by way of Amended Complaint against Defendant, the United States Department of the Army ("Defendant" or the "Army"), alleges and says:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a)(1) (the "Tucker Act").

2. Venue is proper in this Court because the claims herein involve breaches of contract against the United States and the United States Department of the

Army. Venue therefore lies in the United States Court of Claims pursuant to 28 U.S.C. § 1346(a)(2).

**THE PARTIES**

3. Plaintiff LCG 1 Chapel Ave LLC ("LCG ") is a New Jersey LLC, with its principal place of business located at 534 Broadway, Bayonne, New Jersey 07002.

4. Lance Lucarelli ("Lucarelli"), is a citizen of New Jersey and a managing member of LCG LLC.

5. The United States Army (the "Army") is an agency of the United States government.

**STATEMENT OF THE CLAIM**

**The Notice of Availability**

6. On or about September 6, 2013, the Army issued a Notice of Availability for United States Army Reserve Real Property Exchange ("NOA") under the legislative authority of 10 USC § 18240. (Exhibit 1.)

7. The NOA made an offer to exchange fee title to land and facilities of two U.S. Army Reserve ("USAR") properties located in New Jersey for other property on which an exchange partner would build a new USAR center.

8. One Army property was the USAR Center ("USARC") located at Caven Point at the intersection of Caven Point Road and Chapel Avenue in Jersey City, New Jersey ("the Caven Point Property").

9. The Caven Point Property consists of approximately 27 acres of land with approximately 60,252 square feet of improvements.

10. The Caven Point Property is identified by the Hudson County Assessor's office as Block #27401, Lots 10 and 13.

11. The second Army property was the Alexander Hamilton USARC located between Interstate 80 and Highway 17 in Lodi, New Jersey ("the Lodi Property").

12. The Lodi Property consists of approximately 5.33 acres of land with approximately 47,000 square feet of improvements.

13. The Lodi Property is identified by the Bergen County Assessor's Office as Pin # 0231_193.02_1, Block #193.02 Lot 1 and Pin # 0231_286_1.01, Block #296.

14. The NOA sought to exchange the Caven Point and Lodi Properties (collectively the "Exchange Properties") for land and construction of a new USARC in or near Jersey City, New Jersey.

15. The NOA also included a DD 1391 Form setting forth the Military Construction Project Data reflecting the construction scope of work for the new USARC.

16. The NOA specified that the land to be exchanged needed to be at least 20 acres, within an approximately five-mile radius of the existing Jersey City USARC. The NOA set forth other requirements and preferences.

17. The NOA described a four-step exchange process to "ensure that the Government receives the best value from a qualified and responsible Offeror." (Exhibit 1 at. 5.)

18. The first step in the process required all interested applicants or "Offerors" to meet specified qualification requirements. (Id. at 15.)

19. The application process sought extensive and very detailed information including, but not limited to, financial information, relevant experience, references, dispute history, an Offeror profile, a description of the project implementation, summary of the design, and other such information.

20. The second step required approved Offerors to provide written submissions in accordance with the comprehensive requirements of the NOA.

21. The third step consisted of an Offeror Evaluation Process whereby an Evaluation Board reviewed the applications and selected an Offeror as a "conditional Exchange Partner, subject to approval by the DASA [Deputy Assistant Secretary of the Army]." (Id. at 6.)

22. In conducting its evaluation, the Evaluation Board was to evaluate each application "on its own merit, independently and objectively." (Id. at 20.)

23. Following completion of the submission evaluations, the Evaluation Board was to forward the name of the Offeror with the "highest overall ranking to the DASA (IH&P) [Deputy Assistant to the Secretary of the Army] for consideration for selection to serve as the Exchange Partner for this RPX [Real Property Exchange]." (Id. at 21.)

24. Following DASA approval, the third step also contemplated that the Exchange Partner would enter into a Letter Agreement with the USACE Savannah District.

25. Per the NOA, the "Letter Agreement is in furtherance of good faith and exclusive negotiations of a Real Property Exchange Agreement (Appendix 4) between the Exchange Partner and the Government." (Id. at 6)

26. The fourth, and final step of the process, was an "Exchange Agreement," which would document the "specific business terms and legal conditions" as well as the draft conveyance documents. (Id.)

**LCG Submits An Application for the RPX And Enters Into A Letter Agreement With the Army**

27. LCG obtained a right to purchase approximately 20 acres of land located at 84 Harbor Drive in Jersey City, New Jersey (the "Harbor Drive Property"), which would meet the requirements of the Army's RPX. The Harbor Drive Property is also sometimes referenced as the LCG Property or the LCG Parcel.

28. LCG submitted an application to be the Exchange Partner pursuant to the NOA.

29. LCG submitted all required information in connection with the Offeror evaluation step.

30. LCG was approved as an Offeror on or about December 18, 2014, after which it began preparing the detailed and extensive submission required for the second step.

31. The Harbor Drive Property was acceptable to the Army as part of the exchange.

32. At the Army's recommendation, LCG retained Mason & Hanger, an architectural and engineering services firm with extensive experience in working with the U.S. Army, to develop the plans for the new reserve center.

33. Mason & Hanger immediately began preparing the plans for the new reserve center at the Harbor Drive Property.

34. LCG's application was subject to the rigorous review and evaluation set forth in the NOA.

35. LCG's application was selected as the successful application following the Evaluation Board's review of each Offeror's application.

36. LCG's application was approved by the DASA.

37. Accordingly, LCG and the Army entered into a Letter Agreement, dated May 5, 2015, between The United States of America and LCG 1 Chapel Ave LLC (the "Letter Agreement"). (Exhibit 2.)

38. The Letter Agreement was executed on behalf of the Army by Ralph J. Werthmann ("Werthmann"), of the Savannah District, Chief, Real Estate Division, Real Estate Contracting Officer. (Id.)

39. The Letter Agreement provided, among other things, that the proposal of LCG, as the Exchange Partner, was "selected in response to the solicitation dated September 6, 2013, agreeing to the terms and conditions set forth in the solicitation package." (Id.)

40. The Letter Agreement provided that the "Parties acknowledge that this LA [Letter Agreement] is in furtherance of good faith negotiations in contemplation of the conveyance of the Government property known as the Caven Point U.S. Army Reserve Center (USARC) .. . .and the Alexander Hamilton USARC . . .." (Id. at Section 1(a).)

41. The Letter Agreement further provided that it was "specifically and solely intended to support all activities, to include those activities listed in Attachment A,

necessary to complete the contemplated Exchange Agreement so that the exchange will be accomplished at minimal cost to the U.S. Government." (Id. at. Section 1(b).)

42. The Letter Agreement also provided that the parties intend that it "constitute a legally binding contract, notwithstanding the Parties have not yet entered into the Exchange Agreement." (Id. at Section 1(c).)

43. Under the Letter Agreement, LCG paid $186,000.00 to the Army to "fund the estimated cost" of services to be provided by the U.S. Army Corps of Engineers, Savannah District ("USACE"). (Id. at Section 2(a).)

44. LCG was obligated to pay any additional costs for the USACE services above the $186,000.00.

45. The Letter Agreement contained the "entire agreement between the parties regarding funding preliminary activities" for the exchange of the Caven Point and Lodi Properties for the LCG property in Jersey City. (Id. at Section 3 (b).)

46. After signing the Letter Agreement, LCG undertook further activities in furtherance of an exchange agreement.

47. At that point, LCG and the Army moved towards executing an Exchange Agreement.

48. Indeed, on August 3, 2015, Stephen W. Bruce ("Bruce"), Realty Specialist for the U.S. Army Corps of Engineers, Savannah District, forwarded Lucarelli a draft of the Exchange Agreement for review purposes. (Exhibit 3.)

**Terms and Conditions for the Exchange Agreement Between the Department and LCG**

49. On April 7, 2016, the Department and LCG executed a "Summary of Exchange Terms and Conditions for Army Reserve Center located at the Caven Point and Lodi, New Jersey By And Between The United States of America, Acting By and

Through the Army Corps of Engineers and LCG 1 Chapel Ave LLC" (the "Terms and Conditions"). (Exhibit 4.)

50. The Terms and Conditions was part of the fourth and final step of the process towards finalizing the Real Property Exchange ("RPX") that LCG and the Army had been negotiating and working towards.

51. The "Purpose" of the Terms and Conditions provided that:

> The Army and LCG desire to do a Real Property Exchange (RPX) under the authority of 10 USC 18240 and have agreed, in principle, to the principal terms and conditions herein to be included in an Exchange Agreement. Although the Army and LCG mutually intend to pursue an Exchange Agreement based on these terms and conditions, the intent to proceed and these terms and conditions are not binding upon either party unless and until incorporated into an Exchange Agreement signed by both parties following the process set forth herein.

(Id. at 1.)

52. The "Exchange" section described that LCG would convey the Harbor Drive Property to the Army and "construct a new reserve center to include a 66,376 square foot Training Building, a 9,902 square foot Maintenance Building, a 4,254 square foot Unheated Storage Building, and supporting facilities. . . ." (Id. at 2.)

53. The Terms and Conditions provided that, following the negotiation of further terms and conditions, the Army and LCG "will prepare and execute an Exchange Agreement setting forth the terms, conditions and schedule for the exchange of the Reserve Center Parcels for the LCG Parcel and construction" of the various facilities LCG had committed to construct for the Army as part of the Exchange Agreement. (Id. at 2-3.)

54. Exhibit F to the Terms and Conditions set forth "Major Milestones" starting with a "site visit for environmental" and ending with "Construction Completed" and subsequent remediation and conveyance activities. (Exhibit 5.)

55. The Terms and Conditions itself sets forth various activities which LCG or the Army had to complete prior to entering into a final Exchange Agreement.

**LCG Satisfied Its Obligations Under The Terms and Conditions And/Or Was Prevented From Satisfying Its Obligations Due To Actions or Inaction of the Army**

56. LCG immediately began to undertake the tasks required of it under the Terms and Conditions.

57. Term and Condition 1 required LCG to file an "application with the Jersey City Planning Board to obtain development approvals for the construction of the new reserve center on the LCG Parcel." (Exhibit 4 at 2.)

58. LCG immediately hired a surveyor, architect, engineer, and attorneys, and had completed all actions required for the Jersey City Planning Board application by, no later than, November, 2017.

59. Term and Condition 2 required LCG to file an "application with the Jersey City Planning Board to obtain development approvals for the portion of the Caven Point USARC not subject to the leaseback but will not commence any construction until after closing and the exchange of deeds." (Exhibit 4 at 2.)

60. In similar fashion to the LCG Parcel, LCG retained all professionals and services required to prepare the Jersey City Planning Board application for the Caven Point USARC.

61. LCG's application for the Jersey City Planning Board was finalized for submission by, no later than, November, 2017.

62. The "leaseback" portion related to a small parcel on the Caven Point Property that housed a vehicle repair facility that the Army wanted to continue using through the construction of the new USARC on the Harbor Drive Property.

63. Term and Condition 3 required LCG to provide "evidence that clear title can be provided per Department of Justice Standards to the LCG Parcel." (Exhibit 4 at 2.)

64. LCG provided all requested title information to the Army.

65. The Army was satisfied with LCG's compliance with this Term and Condition.

66. Term and Condition 4 required LCG to "[c]lose on the purchase of the LCG Parcel to become the fee owner of the LCG Parcel." (Exhibit 4 at 2.)

67. As the Army was aware, LCG had a right to purchase the LCG Parcel from Harbor Drive Real Estate LLC and Harbor Drive II Real estate LLC (collectively "HDR").

68. LCG provided the Army with copies of the parties' Purchase and Sale Agreement for the Harbor Drive Property evidencing said right.

69. LCG, HDR, and the Army had agreed to a simultaneous closing whereby the Purchase and Sale Agreement for the Harbor Drive Property would be closed at the same time as the final Exchange Agreement.

70. The Army was aware of the plans for a simultaneous closing on the two transactions.

71. The Army approved the simultaneous closing procedure.

72. Term and Condition 5 required that all leases on the Harbor Drive Property be terminated. (Exhibit 4 at 3.)

73. The leases on that property were expiring at or about the same time the final Exchange Agreement was scheduled to be executed.

74. The Army was aware that the leases for the LCG Property were due to expire and would not be renewed based on the anticipated execution of the final Exchange Agreement.

75. This satisfied Term and Condition 5.

76. Term and Condition 6 required LCG to provide a "start date for the construction of the new reserve center." (Exhibit 4 at 3.)

77. LCG could not provide a specific start date for the construction of the new reserve center because the Army was, first, required to issue a Final Finding of Suitability to Transfer ("FOST") and comply with the Army's obligations under the National Environmental Policy Act ("NEPA").

78. As soon as the Army obtained a FOST and NEPA for the LCG Property, LCG was prepared to provide a start date for the construction.

79. The Army was aware that its failure to obtain a FOST and NEPA for the Harbor Drive Property was delaying LCG in its ability to commence construction or provide a construction start date.

80. Term and Condition 7 required LCG to provide a Performance Bond for the construction of the new reserve center to "ensure the delivery of a complete and useable facility prior to the exchange of deeds." (Exhibit 4 at 3.)

81. LCG was fully prepared to obtain a Performance Bond when construction commenced.

82. In fact, on July 2, 2015, Lucarelli sent a letter to Stephen Bruce at the U.S. Army Corps of Engineers, Savannah District Real Estate Division, explaining his plans for the Exchange Properties, including his procurement of a performance bond:

> The aerial plan attached shows the new mixed use building footprint that I am going to construct. The new residential buildings and retail do not disturb the army's existing operations. The second document is the Mason and Hanger budget which outlines the monies to be spent to construct the new U.S. Army facility located at 84 Harbor Drive Jersey City NJ. I will Fund the 66 plus million dollars for the land acquisition and construction of the new facility. We will take title to 84 Harbor Drive and then secure a performance bond for the $30M which is the cost of the new facility. This will guarantee completion of the new facility for the US Army. At the same time we will start construction on 12 acres of the original army base land out of the total 24 acres which is outlined on the aerial plan. I will also need to give the 12 acres as collateral to my construction lender. We will complete the new army facility in a time frame between 16 and 24 months and at completion the US Army will take ownership. The first phase of the mixed use project will be completed within 36 to 48 months. Please have your attorneys draft the Lease Lock and the Real Property Exchange Agreement to reflect these issues listed above so that we can move this project forward. If you would like to discuss this give me a call.

(Exhibit 6.)

83. The Army was aware of LCG's intent and ability to obtain an appropriate Performance Bond and was satisfied that LCG had and could satisfy this Term and Condition.

84. Item 9 of the Terms and Conditions required LCG to "[c]onduct any environmental due diligence on the LCG Parcel and on the Reserve Center Parcels deemed necessary for its own purposes."[1] (Exhibit 4 at 3.)

85. LCG had begun the environmental due diligence process even before executing the Terms and Conditions.

86. LCG first contacted its environmental consultant, Whitman Environmental, on May 20, 2013 and engaged the company on October 31, 2014.

87. On September 1, 2016, Lucarelli received a proposal for site investigation for the Harbor Drive Property from Whitman which he then forwarded to Bruce on September 6, 2016. (Exhibits 7, 8.)

88. On September 21, 2016, Bruce sent Lucarelli his "comments" to the environmental proposal for the Harbor Drive Property. (Exhibit 8.)

89. At substantial cost to LCG, LCG undertook remediation efforts for the Harbor Drive Property as it was conducting its due diligence.

90. LCG proceeded in this manner, which is permitted under New Jersey law, in an effort to advance the RPX process.

91. Even though it was not Lucarelli's or LCG's obligation to conduct site investigation and remediation on the Harbor Drive Property, LCG decided to itself undertake those obligations in order to advance the RPX to a final Exchange Agreement.

[1] Due to an apparent typographical error in the Terms and Conditions there was no item 8. Thus, the numbering skipped from 7 to 9.

**The Army Began To Undertake Their Obligations Under the Terms And Conditions**

92. The Terms and Conditions also included certain obligations for the Army to satisfy.

93. Item 1 required the Army to determine "Fair Market Value of the Reserve Center Parcels and the LCG Parcel." (Exhibit 4 at 3.)

94. The Army requested, and was granted, access to the LCG Property in August 2016 by the then current owner of that property. (Exhibit 9.)

95. Bruce advised Lucarelli that the Army did get a fair market appraisal for the Harbor Drive Property.

96. Item 2 required the Army to "Complete Environmental Condition of Properties (ECPs) for the Reserve Center Parcels and the LCG Parcel. The Government will conduct clean-up to CERCLA standards consistent with past use of the property." (Exhibit 4 at 3.)

97. In an effort to expedite the process, it was LCG that actually conducted clean-up activities on the LCG Parcel (Harbor Drive Property), at its cost and with the Army's knowledge, even though that was the Army's obligation.

98. Term and Condition 3 required the Army to comply with the National Environmental Policy Act (NEPA). (Exhibit 4 at 3.)

99. It is unclear what activities the Army took in that regard.

100. Term and Condition 4 required the Army to conduct "any environmental due diligence on the LCG Parcel deemed necessary for its own purposes. The Government shall have the option to make the determination that LCG Parcel is not environmentally acceptable for the RPX." (Exhibit 4 at 3.)

101. LCG had its own environmental engineer conduct the due diligence and remediation for the Harbor Drive Property.

102. This was acceptable to the Army.

103. The Army never advised LCG or Lucarelli that the Harbor Drive Property was "not environmentally acceptable" but, to the contrary, in 2013, the Army approved the Harbor Drive Property as being environmentally acceptable.

104. Term and Condition 5 required the Army to "[o]btain the survey/legal description for the LCG Parcel." (Exhibit 4 at 3.)

105. Upon information and belief, the Army obtained its own survey/legal description for the LCG Parcel.

106. Term and Condition 6, required the Army to provide "maps/legal descriptions of the Reserve Center Parcels." (Exhibit 4 at 3.)

107. LCG obtained this information from Mason & Hanger, its engineer and architect for the new Reserve Center it would be building for the Army.

108. Thus, LCG satisfied the Army's obligation itself, again at its cost and with the Army's full knowledge and, at least, tacit acceptance.

109. Term and Condition 7 required the Army to "provide the unexecuted Quitclaim Deeds for the Reserve Center Parcels, the unexecuted Warranty Deed for the LCG Parcel, and the leaseback for a portion of the Caven Point USARC." (Exhibit 4 at 3.)

110. The Army never completed this task as further described below.

111. Term and Condition 8 required the Army to "Consent (provide non-objection letter) to the submission of an application by LCG to the Jersey City Planning

Board to obtain development approvals for the portion of the Caven Point USARC not subject to the leaseback and the LCG Parcel." (Exhibit 4 at 3.)

112. LCG had been keeping the Army apprised of its development plans throughout the time period since even before the Terms and Conditions was first signed.

113. The Army never gave any indication of any objection or complaint about LCG's development plans.

114. LCG fully expected the Army to consent to LCG's application to the Jersey City Planning Board.

115. Indeed, the Army advertised the proposed exchange in public areas of Jersey City in an effort to determine whether there were any complaints about the exchange with LCG.

116. Public input is typically taken after the Army is prepared to consent to the development plans.

117. Upon information and belief, there were no public complaints about the proposed development.

118. As described below, the Army unexpectedly and without any reason whatsoever simply terminated the RPX before giving consent for LCG's application.

**The Parties Continued Working Towards**
**An Exchange Agreement Even After December 31, 2016**

119. The Terms and Conditions also provided that if an Exchange Agreement was not signed by December 31, 2016, "the RPX is terminated." (Exhibit 4 at 4.)

120. As a result of the Army's failure to satisfy, or even try to satisfy, several of the conditions of the Letter Agreement, LCG and the Army did not execute an Exchange Agreement by December 31, 2016.

121. Nevertheless, both LCG and the Army continued engaging in activities consistent with the Terms and Conditions in working towards the negotiation and execution of a final Exchange Agreement.

122. Robert Gregory ("Gregory") was the RPX Program Manager for the Army Reserve Installation Management Directorate.

123. On March 31, 2017, Lucarelli sent Bruce and Gregory a Site Investigation Report for the Harbor Drive Property. (Exhibit 10.)

124. On April 10, 2017, Bruce, the Senior Realty Specialist for the U.S. Army Corps of Engineers (Savannah District), wrote to Gregory, attaching a draft of an Exchange Agreement that had been sent to Lucarelli in August 2015. (Exhibit 11.)

125. Bruce wrote that the draft of the Exchange Agreement was prepared before the Terms and Conditions was executed and that the Exchange Agreement "needs to be updated to mirror the Term sheet" included in the Terms and Conditions. (Id.)

126. Gregory then wrote to Lucarelli stating that he could not believe that the most recent draft of the Exchange Agreement was almost two years old and asked Lucarelli to check his files for a more recent version. (Id.)

127. On April 11, 2017, Gregory wrote to Lucarelli to discuss the schedule for a meeting between the Army Reserve and the USACE, taking place on April 12, 2017. During the meeting, Lucarelli was to brief all participants on the LCG "project." (Exhibit 12.)

128. The April 12, 2017 meeting also included visits to the existing Caven Point Army Reserve Center as well as a visit to the Harbor Drive Property.

129. Gregory's April 11, 2017 e-mail also provided some "good news on the environmental side of things. . ." insofar as the Army intended to have its Environmental Condition of Property Report ("ECP") for the Harbor Drive Property completed by May 1, 2017. (Exhibit 12.)

130. Gregory's April 11, 2017 e-mail also addressed the Exchange Agreement. Gregory expressed concern that the 2015 draft of the Exchange Agreement was the latest stating that if that was the most recent iteration, that meant that:

> . . . . Bruce failed to do what I asked him to which was to send you a draft to start working not very long ago, numerous times and to make sure it included the language you need. I am taking that issue up with his supervisors today and expect that they should be getting a clean draft to you before long.

(Exhibit 12.)

131. On May 18, 2017, Lucarelli wrote to Bruce asking for any existing environmental documentation for the Caven Point Property. (Exhibit 13.)

132. On May 19, 2017, Gregory responded back to Lucarelli and Bruce attaching two documents that document ongoing remediation at the Caven Point Property. (Exhibit 13.)

133. Gregory's May 19, 2017 e-mail attached a Draft Technical Memorandum, prepared by engineering firm, CH2MHill, entitled "Addendum to the Remedial Investigation Report/Remedial Action Work Plan – Summary of Quarterly Groundwater Sampling Activities at Caven Point United States Army Reserve Center" (the "Caven Point Work Plan"). (Exhibit 13.)

134. The Caven Point Work Plan reflected that there had been previous environmental investigation and remediation activities undertaken on the site, including the removal of 82,693 tons of impacted soil.

135. LCG and Lucarelli were unaware of these activities until they received the Caven Point Work Plan in May 2017.

136. On May 19, 2017, Gregory wrote to both Lucarelli and Bruce advising that the final draft ECP for the Caven Point Property was with "the 99th RSC for review so it can be staffed for signature." (Exhibit 14.)

137. By May 22, 2017, Lucarelli had the Trade Breakdown, itemizing the costs associated with building the Army Reserve Centers at the Harbor Drive Property. (Exhibit 15.)

138. On June 1, 2017, Bruce wrote to Michael Lohan ("Lohan"), the General Engineer for the 99th Division, stating that the "exchange partner has requested access to the Caven Point USARC. He does not need to go inside any buildings, he just wants to walk his team around the property." (Exhibit 16.)

139. Lohan wrote back giving Bruce two points of contact with whom Lucarelli could coordinate in obtaining site access as the "exchange partner." (Id.)

140. On June 5, 2017, Gregory, Lucarelli and Vincent Giordano of the 99th Division coordinated a site visit by Lucarelli as the "Exchange Partner" for Friday, June 8, 2017. (Exhibit 17.)

141. In early June 2017, Bruce and Gregory cooperated with Lucarelli in providing him site access to the Caven Point Property. (Exhibits 18, 19.)

142. On June 14, 2017, Lucarelli wrote to Bruce and Gregory stating that his LSRP (Licensed Site Remediation Professional) was requesting environmental information concerning the Caven Point site to allow him to "determine the impact of on-going remedial actions on your redevelopment of the subject site. . ." (Exhibit 20.)

143. In particular, David Draper, an environmental consultant for Lucarelli and LCG, had located a Tracking Report for the Caven Point Property, reflecting that ongoing environmental remediation and monitoring was being conducted by C2HM-Hill. (Exhibit 21.)

144. The next day, Gregory forwarded Lucarelli an e-mail from Jeffrey Hrzic ("Hrzic"), the Chief of the Environmental Division for the 99th Division, concerning the Caven Point ARC Remediation Status. (Exhibit 22.)

145. In his e-mail to Gregory, Hrzic concluded that "all remediation actions will be complete for the site, and the site should be classified as a Type 4 property. More importantly, the site has been thoroughly investigated and is expected to be free from an[y] encumbrances to future non-residential development. The site is 'shovel ready'." (Exhibit 22.)

146. In his e-mail to Lucarelli forwarding the remediation information, Gregory wrote: "This is info for your benefit on the Army Reserve property at Chapel Avenue. I have asked them to provide me with copies of everything when they complete this action and will get them to you once I receive. In the meantime, I hope this is helpful." (Id.)

147. On September 29, 2017, Lucarelli wrote to Bruce with a cc: to Gregory asking to set up a time with the Army's "legal team to finalize the exchange document . . . ." (Exhibit 23.)

148. In his September 29, 2017 e-mail, Lucarelli advised Bruce and Gregory that "I completed the tasks on my end and the ball is in your court." (Exhibit 23.)

149. On October 2, 2017, Lucarelli wrote to Bruce summarizing the status of the environmental work on the Harbor Drive Property:

> We started the environmental assessment on the replacement property 84 Harbor Drive in April of this year. Since your department didn't understand that you could build the new facility and clean the site at the same time, I hired Whitman environmental on May 2 2017 to expedite the cleanup. Chris Esposito is the contact person for Whitman and he immediately started and completed the remediation at 84 Harbor drive. Not once has anyone contacted me or Chris over the last 5 months concerning the remediation. Also no one has given me access to anyone or the documents concerning the environmental cleanup that is ongoing at the caven point reserve property. I sent you and my attorney an email on April 21 2017 11:18 am asking for a date to go over the exchange document you responded to the email at 11:35 am stating that we would have a call with your attorney and Nicholas Racioppi set for April 27th 10:30 am that call never happened. You sent me another email on 3-24-2017 which you say in the email (I would estimate signing an exchange agreement in the fall) Stephen we are right on time so we need to get on a call to finalize the RPX so I can engage mason and hanger to design the army's new facility at 84 harbor drive and then start construction.
> Lance

(Exhibit 24.)

150. On November 21, 2017, Lucarelli wrote to Bruce asking him to sign a General Development Application and an Affidavit of Ownership that would allow

Lucarelli and LCG to seek site plan approval from Jersey City for LCG's proposed development on the Caven Point Property. (Exhibit 25.)

151. The General Development Application for the Caven Point Property sought conceptual plan/informal review, preliminary major site plan, and final major site plan approvals.

152. The General Development Application itself reflected that the development consisted of a total of 36 townhouses, 436 apartment dwelling units, commercial space, and 2,639 parking spaces. (Exhibit 25.)

153. Bruce and the Army were aware of these development plans prior to Lucarelli's e-mail to Bruce requesting the Army's execution of the General Development Application.

154. Both before and after the December 31, 2016 expiration date, the Army continuously engaged in actions and conduct consistent with the execution of a final Exchange Agreement.

155. The Army and its representatives treated LCG and Lucarelli as the Exchange Partner and encouraged his development activities for the Caven Point site.

156. The Army led LCG and Lucarelli to believe that it was committed to pursuing the RPX and all that remained was finalizing the remaining terms for the Exchange Agreement.

157. LCG spent over $100,000.00 during this period with the Army's full knowledge.

**<u>The Army Was Well Aware That Lucarelli and LCG Were Engaging In Development Activities for The Caven Point Property</u>**

158. LCG and Lucarelli had plans to develop the Caven Point Property following the RPX.

159. LCG named the development "The Shops & Living at Liberty" (the "Development").

160. The Development included upscale town homes, condominiums, stores, a park, a skating ribbon, and other attractive amenities.

161. The Army was well aware that Lucarelli and LCG intended to develop the Caven Point Property.

162. Indeed, the Army was aware that development along the lines of that contemplated in The Shops & Living at Liberty was the impetus for Lucarelli's pursuit of an RPX in the first place.

163. In order for the RPX to be profitable for LCG, it had to be in a position to develop the Caven Point Property promptly following the exchange.

164. It was not reasonable or feasible for LCG to wait until after the final Exchange Agreement was executed to start the plans and specifications needed for the Development.

165. The Army knew that LCG had begun work on the plans and specifications needed for the Development soon after the parties entered into the Letter Agreement.

166. The Army knew that LCG was paying consultants, architects, engineers, environmental specialists, and other professionals to assist in the development efforts.

167. The Army knew that, in order for the RPX to be economically feasible for LCG, it had to be in a position to start construction soon after the exchange.

168. The Army did not discourage LCG or Lucarelli from pursuing the Development.

169. If anything, the Army encouraged LCG and Lucarelli by cooperating with LCG and Lucarelli in arranging site visits, obtaining information about the Caven Point Property and providing it to LCG and Lucarelli, referencing LCG and Lucarelli as its Exchange Partner, and otherwise cooperating where necessary with LCG's inquiries.

**The Army's Unexpected and Unexplained Termination of the RPX**

170. After working together for nearly three years with the intent of entering into a final Exchange Agreement, on February 8, 2018, Brenda M. Johnson-Turner, director of Real Estate for the Army wrote to Lucarelli stating that:

> After a comprehensive analysis and review of evolving requirements for the units using the Caven Point Reserve Center, the Army has decided not to continue with the subject RPX. Per the Letter Agreement executed May 5, 2015, Section 3.a, the United States of American is exercising its right to terminate this RPX effective February 20, 2018 (the "Termination Letter").

(Exhibit 26.)

171. The Letter Agreement specifically obligated the Army to engage in exclusive, good faith negotiations with Lucarelli to complete the RPX.

172. By its express terms, the Letter Agreement constituted "a legally binding contract, notwithstanding the Parties have not yet entered into the Exchange Agreement."

173. As of February 8, 2018, LCG had satisfied the requirements set forth under the Letter Agreement.

174. The Terms and Conditions required the Army to negotiate "satisfactory terms and conditions" for an Exchange Agreement with LCG.

175. LCG performed all that was required of it under both the Letter Agreement and the Terms and Condition, and worked diligently, and in good faith, toward the execution of a final Exchange Agreement with the Army.

176. The Terms and Conditions did not give the Army a right to terminate the RPX prior to such negotiations.

177. Prior to receiving the Termination Letter, the Army had never given LCG any notice that it was considering terminating the RPX.

178. Prior to receiving the Termination Letter, the Army had never advised LCG that it was conducting any type of "comprehensive analysis" or "review of evolving requirements" with respect to the units at the Caven Point Reserve Center.

179. At no time did the Army ever advise LCG of any dissatisfaction with its plans, any work on the project, or any aspect of the services it was providing, which would support terminating the RPX.

180. Since receiving the Termination Letter, the Army has not given LCG any further indication as to why it was terminating the RPX.

181. The Army acted in bad faith in its negotiations with LCG and wrongfully terminated the RPX.

182. As of the date LCG received the Termination Letter, it had spent over $800,000.00 in out-of-pocket expenses in working with the Army to finalize an Exchange Agreement.

**Third-Party Influence on the Army to Terminate the RPX**

183. LCG had extensive and impressive plans for the Caven Point Property.

184. These plans included luxury townhomes and residences, upscale shops, a park with a European-style ice skating ribbon, and other tasteful amenities.

185. The Caven Point Property borders the Liberty National Golf Course, which is owned by venture capitalist Paul Fireman ("Fireman") or one of Fireman's ownership entities.

186. Fireman had expressed great interest in obtaining the ownership of, or access rights to, the Caven Point Property.

187. After Fireman learned that LCG was pursuing an RPX agreement with the Army, Fireman contacted LCG to learn more about its plans for the Caven Point Property.

188. In or about May 2014, Fireman visited LCG's office to review the Master Plan Lucarelli had created for the Caven Point Property.

189. Lucarelli even provided Fireman with a copy of the most recent Master Plan.

190. On May 6, 2014 Lucarelli wrote to Fireman, further expounding on his plans and offering Fireman an investment proposal. (Exhibit 27.)

191. On June 25, 2014, an attorney for Fireman wrote to John Cali, one of LCG's partners, that he wanted to "discuss the army base with you and Lance." (Exhibit 28.)

192. Fireman's lawyer continued that, "Paul Fireman has basically offer[ed] $5 million for the option or to step into your shoes, as well as to pave the chapel ave lot and get paid back out of the parking revenue 75/25 until paid off then flip 25/75 and the right to use the lot for a week ever year there i[n] a major tournament." (Id.)

193. Lucarelli and LCG rejected this proposal.

194. In July 2014, newspaper articles began to appear relating to efforts by Fireman to develop a multi-billion dollar casino in Jersey City.

195. For example, on July 9, 2014, the Associated Press published an article entitled "Developer pitches $4.6B Jersey City casino." (Exhibit 29.)

196. The article reported that Paul Fireman, described as a venture capitalist, wanted to build a $4.6 billion casino in Jersey City near Liberty State Park.

197. The Associated Press article quoted State Senator Ray Lesniak as being supportive of a casino and that he and then Governor Chris Christie, as well as other politicians, were briefed by "Fireman's group."

198. In another article in nj.com, it was reported that Fireman had been "quietly meeting with leading New Jersey politicians in recent months, pushing a proposal for a casino and hotel rising 95 floors above New York Harbor." (Exhibit 30.)

199. Officials from Jersey City expressed enthusiasm about the potential for a facility that would include a casino, hotel and convention center as well as the largest ferris wheel in the world all located next to Liberty State Park." (Id.)

200. The nj.com article reported that "[a]ccording to lawmakers, the casino would be situated near the waterfront, next to the Liberty National Golf Course. . . ." The Caven Point Property is next to the Liberty National Golf Course and near the waterfront. (Id.)

201. Accordingly, it appeared that Fireman and certain New Jersey legislators had alternative plans for the Caven Point Property that did not include LCG.

202. Upon information and belief, Fireman has been continuing to pursue his own plans to develop the Caven Point Property.

203. In or about May of 2016, the PGA of America (the "PGA") made specific request of the 99th Regional Support Command ("99th RSC") to use portions of the Army's facilities at the Caven Point Property for a 2017 PGA tour event, and specifically raised the issue of a real property exchange between the PGA and the Army for the Caven Point Property.

204. On May 4, 2016, Julian Nierva ("Nierva"), LTC, Deputy Staff Judge Advocate for the 99th RSC, wrote to Matt Kamienski ("Kamienski") of the PGA to respond to the PGA's inquiry regarding the Caven Point Property. (Exhibit 31.)

205. Nierva wrote that the "99th Regional Support Command has responsibility for that facility and can assist you with this request." Nierva went on to write that they were "unsure of exactly what your organization is asking of us" but that "[p]preliminary indications were that your organization wanted an area to park vehicles but in speaking with Mr. Flaschner [of the PGA], **it appears that your request may involve much more, to include a possible real property exchange."** (Id.) (emphasis added).

206. In May of 2016, Nierva knew, or should have known, that LCG was engaged in an RPX at that time for the Caven Point Property.

207. In May of 2016, Fireman, Liberty National and the PGA were fully aware that Lucarelli and LCG were pursuing an RPX with the Army for the Caven Point Property.

208. Nierva asked Kamienski to send a "detailed request [to] specifically layout out what your organization seeks from the 99th RSC." (Id.)

209. On August 29, 2016, Kamienski wrote back to Nierva, with a copy to other members of the 99th RSC, concerning the PGA's intentions with regard to the Caven Point Property. (Id.)

210. In his August 29, 2016 e-mail, Kamienski asked for a phone call to "discuss use of the Caven Point Army reserve Center during our event next year." (Id.)

211. Kamienski continued that:

> In the near term we are hoping to acquire use of the land for parking, staging and TV operations in the lead up and during the Presidents Cup which will be held at Liberty National Golf Club the week of September 25th next year. **There is long term vision surrounding the possibility of land swap, etc. based on the 25 year agreement between LNGC [Liberty National Golf Course] and the PGA TOUR that will see at minimum 8 events played over the course of the contract.** I think it's best to focus on the near term needs and discuss other possibilities as they become more clear.

(Id.) (emphasis added).

212. On the same day, August 29, 2016, Paul Sayah ("Sayah"), Deputy Directorate of Public Works ("DPW") for the 99th RSC, wrote to David Robinson Chief of Assets, Army Reserve Installation Management Directorate ("ARIMD") regarding the PGA's interest in the Caven Point Property. (Id.)

213. Sayah wrote that:

> The PGA Tour is requesting to use the Army Reserve facilities at Caven Point, NJ in connection with a tour event scheduled 25 Sep – 1 Oct 2017.
>
> Additionally there is also interest in an RPX. For this matter we are only focusing on the request for 2017.
>
> I am cautious to consider an 833 at Caven Point due to the ongoing discussions and RPX that your office is working.
>
> Please review the request below and feel free to talk with Mr. Matt Kamienski of PGA TOUR, INC. on this matter.
>
> They are looking to primarily use the site for TV equipment/studio air coverage.
>
> We are looking for any advice that will help us in determine if an 833 is doable for the planned event.

(Id.)

214. On December 22, 2016, Gregory, the RPX Program Manager, rejected the PGA's request to use the Caven Point Property and responded that:

> **In view of the progress being made on consummating the Exchange Agreement, and the City's approval of the Exchange Partner's Master Plan, we anticipate that some construction will start within the next 6 – 8 months on our site.** This, coupled with security concerns, would preclude allowing any outside source access and use of the facilities.

(Id.) (emphasis added).

215. Even though Gregory had rejected the PGA's use of the Caven Point Property based on the existing RPX, the PGA persisted in seeking access to the site trying to leverage the favors it had extended to the 99th Army Division in the past, and accommodations it was prepared to make going forward.

216. On July 20, 2017, Lucarelli and Gregory exchanged e-mails concerning Liberty National's request for use of the Caven Point Property. (Exhibit 32.)

217. In an e-mail to Lucarelli, Gregory wrote that the golf course used the Caven Point Reserve center as a "staging area" in August 2013. (Id.)

218. Gregory went on to state that the "[p]roblem is with our side is that it appears at the moment it may have been allowed without paperwork. Not sure yet and I have people digging to verify. The point of contact who approached the Army to utilize the Reserve Center for this is a Mr. Hurley – not sure if he is associated with Liberty National or just the PGA." (Id.)

219. Gregory also wrote that in his July 20, 2017 e-mail that:

> The person I am more concerned with on the Army side and who I need to find out whether or not he is getting any kind of free stuff from any of this is a Paul Sayah with the 99th. He has been there all of this time and has a strange approach to all of this. As I get more info I will get it to you.

(Id.)

220. In an August 2, 2017, Patrick Hurley ("Hurley") of the PGA admitted in an e-mail that the PGA was attempting to leverage favors that the PGA had provided to the Army in exchange for use of the Caven Point Property:

> In the past we [the PGA] have used this Army Base for staging space (2009 & 2013) and didn't need it for working space, however, they would of [sic] allowed us for use in 2013 if we so chose to do so. **In the past, we have also funded their [the Army's] Holiday Party, which we would certainly look to do again in 2017**.

(Exhibit 33) (emphasis added).

221. **Hurley further admitted that he had been negotiating with Brandi Peraria and Vinny Giordano of the 99th RSC for a year to attempt to obtain**

**use of the Caven Point Property -- while LCG was diligently, and in good faith, pursuing an RPX with the Army. Tellingly, Hurley further admitted that the PGA was sponsoring an event for the wives and families of military personnel as an inducement to the PGA's use of the Caven Point Property:**

> . . . who have been as accommodating as can be (both are with 99th RSC, DPW, Real Estate). They have been a huge help, and really have worked with us to get to where we are today. **We've been meeting and talking with them for the last year +, have a solid plan for how we will be utilizing the base, security, etc., which everyone on their team has blessed and signed off on (General of the base included I believe). This started out as conversations and dialog that these guys would love to work with us, support this important event in JC, and how it's been escalated to the top (Washington) where they need to do an appraisal, get fair market value, etc.**
>
> For us, this piece of land is one of the most crucial as it's serving as NBC Sports Broadcast Compound, who will be broadcasting the event to over a billion people around the world. This is the first time the Presidents Cup has been in the NY/NJ Metro area.
>
> The PGA TOUR has had a close working relationship with the military, and support of our troops. **We are hosting an Operation Shower at Liberty National Golf Course on the Sunday before event week for wives and families of military men oversees [sic] which is a big program across the board at the PGA TOUR.**

(Id.) (emphasis added).

**The Army Wrongfully and in Bad Faith Terminates the RPX with LCG**

222. On November 21, 2017, Lucarelli wrote to Bruce asking him to sign the General Development Application for Jersey City and the Affidavit of Ownership, both of which were needed for Lucarelli to obtain site plan approval for the LCG development at the Caven Point Property. (Exhibit 34.)

223. LCG's filing of such application with the Jersey City Planning Board was one of the tasks set forth in the Terms and Conditions executed by LCG and the Army in April 2016.

224. In response, Bruce responded that "Since an exchange agreement has not been executed, the work you have been performing is at your own risk. We discussed this back in May/June 2017. The Reserves have a meeting in mid-December to finalize the path forward. As I have stated before, I will contact you once the Reserve have made a decision." (Exhibit 35.)

225. Bruce copied Ralph Werthmann, who had executed the Terms and Conditions on behalf of the Army, on his e-mail.

226. Bruce was aware that LCG's work was part of the Terms and Conditions Agreement LCG and the Army had executed in April 2016.

227. Bruce was aware that LCG and the Army intended to execute an Exchange Agreement.

228. In fact, on April 10, 2017, Bruce had written to Gregory, that because the most recent draft of the Exchange Agreement had been sent to Lucarelli in August 2015, the Exchange Agreement had to be updated to "mirror the Term sheet." (Exhibit 36.)

229. This e-mail showed that, as of April 10, 2017, the Army was fully intending to modify and execute an Exchange Agreement consistent with the Terms and Conditions.

230. As of May 1, 2017, Bruce had advised Lucarelli that he would be sending an updated Exchange Agreement.

231. Indeed, as of September 29, 2017, Lucarelli and Bruce were negotiating a final Exchange Agreement.

232. Neither Bruce nor anyone else on behalf of the Army ever advised Lucarelli, or anyone on behalf of Lucarelli or LCG that work they had performed to develop the Caven Point Property was at their "own risk."

233. Bruce's statement that "[w]e discussed this back in May/June 2017," was false.

234. Bruce's comment that "[t]he Reserves have a meeting in mid-December to finalize the path forward," indicated that the 99th RSC was going to have a meeting to discuss the RPX.

235. The 99th RSC was not responsible for negotiating the RPX and had not previously had any input into approving the RPX or negotiating the Exchange Agreement.

236. It was not the 99th RSC's decision to move forward with the RPX.

237. Rather, the RPX was a decision made by the "United States of America, acting by and through the Department of the Army, Army Corps of Engineers."

238. The RPX was being managed by Gregory, the RPX Program Manager for Army Reserve Installation Management Directorate, based in Fort Belvoir, Virginia.

239. Accordingly, Bruce's statement to Lucarelli that the "Reserves" would be making a decision about the RPX was contrary to the terms of the Terms and Conditions and indicated a procedure that was different from, and contrary to, that set forth in the Terms and Conditions.

240. Upon information and belief, the 99th RSC wrongfully, and in bad faith, influenced the Army to terminate the RPX.

241. Upon information and belief, the 99th RSC was unduly influenced by the PGA to advocate for the termination of the RPX in consideration for favors and accommodations that the PGA had made, and promised to continue to make, to the 99th RSC.

242. Upon information and belief, the 99th Division interfered with the RPX to the detriment of LCG and to the preference of the PGA.

243. Upon information and belief, Major General Troy D. Kok, who had command of the 99th RSC, advised and encouraged Lieutenant General Charles D. Luckey, the Chief of Army Reserve and Commanding General, United States Army Reserve Command to terminate the RPX.

244. Upon information and belief, Lieutenant General Luckey directed that the RPX be terminated.

**FIRST CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

245. Plaintiff repeats the allegations contained in paragraphs 1 through 244 of this Amended Complaint ("Complaint") and incorporates those allegations in this Cause of Action as if fully set forth herein.

246. The Letter Agreement and Terms and Conditions are valid and enforceable contracts between LCG and the Army.

247. The Letter Agreement was executed and approved with a governmental agent with actual authority to bind the United States.

248. The Letter Agreement specifically obligated the Army to engage in exclusive, good faith, negotiations with Lucarelli to complete the RPX.

249. By its express terms, the Letter Agreement constituted "a legally binding contract, notwithstanding the Parties have not yet entered into the Exchange Agreement."

250. The Terms and Conditions were executed and approved with a governmental agent with actual authority to bind the United States.

251. The Terms and Conditions explicitly set forth the parties' mutual intent to pursue an Exchange Agreement based on the terms and conditions set forth therein.

252. The Terms and Conditions reflected a mutual intent to execute an Exchange Agreement following Plaintiff's satisfaction of conditions set forth in the Terms and Conditions.

253. Plaintiff performed all that was required of it under both the Letter Agreement and the Terms and Condition, and worked diligently, and in good faith, toward the execution of a final Exchange Agreement with the Army.

254. Plaintiff satisfied the conditions set forth under the Letter Agreement and Terms and Conditions, and expended substantial time and money satisfying those conditions.

255. The Army accepted the benefit of the services and other investments expended by Plaintiff in satisfying the conditions set forth under the Letter Agreement under the Terms and Conditions.

256. The Army encouraged Plaintiff to satisfy the conditions of the Letter Agreement and Terms and Conditions, and to pursue the RPX.

257. The Army was aware that Plaintiff was expending money to satisfy their obligations under the Letter Agreement and Terms and Conditions.

258. The Army was aware that Plaintiff was expending money to satisfy their obligations under the Letter Agreement and Terms and Conditions **after** December 31, 2016.

259. The Army encouraged Plaintiff to satisfy the conditions of the Letter Agreement and Terms and Conditions, and to pursue the RPX **after** December 31, 2016.

260. The Army waived any right to terminate the RPX effective December 31, 2016 by knowingly continuing to accept the benefits of Plaintiff's good faith pursuit of the RPX **after** that that date

261. The Letter Agreement and Terms and Conditions obligated the Army to engage in the negotiations for the execution of the RPX in good faith, and exclusively with LCG.

262. The Army's termination of the RPX was wrongful, was without justification, and was undertaken in bad faith.

263. LCG was fully prepared to engage in the negotiation of satisfactory terms and conditions for an Exchange Agreement.

264. The Army's wrongful termination of the RPX constitutes breach of contract as a matter of law.

265. Plaintiff has been damaged as a direct and proximate result of the Army's breach of contract.

**SECOND CAUSE OF ACTION**
**(BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING)**

266. Plaintiff repeats the allegations contained in Paragraphs 1 through 265 of this Complaint and incorporates those allegations in this Cause of Action as if fully set forth herein.

267. The Letter Agreement and Terms and Conditions contain an implied covenant of good faith and fair dealing.

268. The Army breached the covenant of good faith and fair dealing by failing to negotiate with Plaintiff in good faith to execute the RPX.

269. The Army breached the covenant of good faith and fair dealing by wrongfully, and without justification or explanation, terminating the RPX.

270. The Army breached the covenant of good faith and fair dealing by negotiating with the PGA, for over a year, for the use of the Caven Point Property while Plaintiff was diligently pursuing the RPX.

271. The Army breached the covenant of good faith and fair dealing by wrongfully terminating the RPX in consideration of favors and accommodations made, and promised to it, by the PGA.

272. Plaintiff has been damaged as a direct and proximate result of the Army's breach of its covenant of good faith and fair dealing.

**THIRD CAUSE OF ACTION**
**(VIOLATION OF THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION)**

273. Plaintiff repeats the allegations contained in Paragraphs 1 through 272 of this Complaint and incorporate those allegations in this Cause of Action as if fully set forth herein.

274. The Fifth Amendment of the U.S. Constitution provides that private property cannot be taken for public use without just compensation.

275. LCG has a protectable private interest in the Caven Point and Lodi Properties and its contractual right to the same.

276. The Army, by failing to honor its agreement with LCG, has denied and/or taken LCG's personal property rights without compensation and without justification.

277. Plaintiff has been damaged as a direct and proximate result of the Army's violation of the Fifth Amendment.

**WHEREFORE**, Plaintiff demands judgment against the Defendant for the following relief:

a. The full amount of its compensatory damages, which is in an amount that exceeds the sum or value of $75,000.

b. Prejudgment interest;

c. Attorneys' fees and costs; and

d. Such other and further relief as the Court deems just and equitable.

**DESIGNATION OF TRIAL COUNSEL**

Plaintiff hereby designates Nicholas Racioppi, Jr. Esq. and Marc D'Angiolillo as its trial counsel.

RIKER, DANZIG LLP
*Attorneys for Plaintiff,*
LCG I Chapel Avenue LLC

By: /s/ *Nicholas Racioppi, Jr.*_____
Nicholas Racioppi, Jr. Esq.

Headquarters Plaza
One Speedwell Avenue
PO Box 1981
Morristown, NJ 07962-1981
(973) 538-0800
nracioppi@riker.com

Dated: July 1, 2022

5363737v2